# Exhibit A

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT,
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO: 2015-020387-CA-01

DYNASTY MANAGEMENT, LLC.,

      Plaintiff,

v.

AUGUST ALSINA, SHEILA SANDERS;
NNTME MUCO, LLC., HENRY LEE,
DONALD ALBRIGHT, DITTO MUSIC, LTD.,
MATT PARSONS, DEF JAM RECORDINGS, INC.,
STEVE BARTELS, UNIVERSAL MUSIC GROUP, INC.,
and LUCIAN GRAINGE

      Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff of the State:

      YOU ARE COMMANDED to serve this summons and a copy of the complaint in this action on
Defendant:

> Universal Music Group, Inc.
> The Corporation Trust Company
> Corporation Trust Center
> 1209 Orange Street
> Wilmington, DE 19801

      Each Defendant is required to serve written defenses to the complaint on Plaintiff's attorney,
whose address is:

> Andrew Williams, Esq.
> The Williams Law Group
> 6273 Sunset Drive, Suite D3
> South Miami, FL 33143

within 20 calendar days after service of this summons on that Defendant, exclusive of the day of service,
and to file the original defenses with the clerk of this court either before service on Plaintiff's attorney or
immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for
the relief demanded in the complaint.

                        JAN 25 2016
      Dated: December ___, 2015

      Harvey Ruvin
      Miami-Dade County Clerk of Courts

      By: _____
           Deputy Clerk

## IMPORTANT

To the Defendant(s): A lawsuit has been filed against you in the above titled court by Plaintiff. Plaintiff's claim is stated in the written complaint, a copy of which is served upon you with this summons.

In order to defend against this lawsuit, you must respond to the complaint by stating your defense in writing, and serving a copy upon the person signing this summons within 20 calendar days after the service of this summons, excluding the day of service. A phone call will not suffice or protect you. If you do not file your response on time, a default judgment may be entered against you without notice. A default judgment is one where Plaintiff is entitled to what it asks for because you have not responded. If you serve a notice of appearance on the undersigned person you are entitled to notice before a default judgment may be entered.

If you wish to seek the advice of an attorney in this matter, you should do so promptly so that your written response, if any, may be served on time. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response with the Clerk of the Court, you must also mail or take a copy of your written response to the "Plaintiff's Attorney" named below. The central location of the Clerk's office is at the Dade County Courthouse, 73 West Flagler Street, Room 133, Miami, Florida 33130.

January 26, 2016
Dated: ~~December ___, 2015~~

THE WILLIAMS LAW GROUP
*Attorney for Plaintiff*
6273 Sunset Dr, Suite D-3
South Miami, Florida 33143
Telephone: (253) 970-1683
· Email: Andrew@TheWilliamsLG.com
Secondary Email: WilliamsLawFlorida@gmail.com

By: _____
ANDREW WILLIAMS, ESQ.
FL Bar No. 0111817

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT,
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO: 2015-020387-CA-01

DYNASTY MANAGEMENT, LLC.,

    Plaintiff,

v.

AUGUST ALSINA, SHEILA SANDERS,
NN'TME MUCO, LLC., HENRY LEE,
DONALD ALBRIGHT, DITTO MUSIC, LTD.,
MATT PARSONS, DEF JAM RECORDINGS, INC.,
STEVE BARTELS, UNIVERSAL MUSIC GROUP, INC.,
and LUCIAN GRAINGE

    Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA:
To Each Sheriff of the State:

    YOU ARE COMMANDED to serve this summons and a copy of the complaint in this action on
Defendant:

> **Universal Music Group, Inc.**
> The Corporation Trust Company
> Corporation Trust Center
> 1209 Orange Street
> Wilmington, DE 19801

    Each Defendant is required to serve written defenses to the complaint on Plaintiff's attorney,
whose address is:

                Andrew Williams, Esq.
                The Williams Law Group
                6273 Sunset Drive, Suite D3
                South Miami, FL 33143

within 20 calendar days after service of this summons on that Defendant, exclusive of the day of service,
and to file the original defenses with the clerk of this court either before service on Plaintiff's attorney or
immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for
the relief demanded in the complaint.

                     **JAN 2 5 2016**
    Dated: December __, 2015

                Harvey Ruvin
                Miami-Dade County Clerk of Courts
                **STEPHANIE CASSEUS**
        By:_____
                     Deputy Clerk

## IMPORTANT

To the Defendant(s): A lawsuit has been filed against you in the above titled court by Plaintiff. Plaintiff's claim is stated in the written complaint, a copy of which is served upon you with this summons.

In order to defend against this lawsuit, you must respond to the complaint by stating your defense in writing, and serving a copy upon the person signing this summons within 20 calendar days after the service of this summons, excluding the day of service. A phone call will not suffice or protect you. If you do not file your response on time, a default judgment may be entered against you without notice. A default judgment is one where Plaintiff is entitled to what it asks for because you have not responded. If you serve a notice of appearance on the undersigned person you are entitled to notice before a default judgment may be entered.

If you wish to seek the advice of an attorney in this matter, you should do so promptly so that your written response, if any, may be served on time. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response with the Clerk of the Court, you must also mail or take a copy of your written response to the "Plaintiff's Attorney" named below. The central location of the Clerk's office is at the Dade County Courthouse, 73 West Flagler Street, Room 133, Miami, Florida 33130.

January 26, 2016
Dated: December ___, 2015

THE WILLIAMS LAW GROUP
*Attorney for Plaintiff*
6273 Sunset Dr, Suite D-3
South Miami, Florida 33143
Telephone: (253) 970-1683
Email: Andrew@TheWilliamsLG.com
Secondary Email: WilliamsLawFlorida@gmail.com

By: _____
ANDREW WILLIAMS, ESQ.
FL Bar No. 0111817

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT,
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO:  2015-020387-CA-01

DYNASTY MANAGEMENT, LLC.,

     Plaintiff,

v.

AUGUST ALSINA, SHEILA SANDERS,
NNTME MUCO, LLC., HENRY LEE,
DONALD ALBRIGHT, DITTO MUSIC, LTD.,
MATT PARSONS, DEF JAM RECORDINGS, INC.,
STEVE BARTELS, UNIVERSAL MUSIC GROUP, INC.,
and LUCIAN GRAINGE

     Defendants.

_____/

## AMENDED COMPLAINT

Plaintiff, DYNASTY MANAGEMNT, LLC ("MANAGER"), by and through undersigned counsel does hereby sue Defendants, AUGUST ALSINA ("ALSINA"), SHEILA SANDERS ("SANDERS"), NNTME MUCO, LLC., ("NOONTIME"), HENRY LEE ("LEE"), DONALD ALBRIGHT ("ALBRIGHT"), DITTO MUSIC, LTD., ("DITTO"), MATT PARSONS ("PARSONS"), DEF JAM RECORDINGS, INC., ("DEF JAM"), STEVE BARTELS ("BARTELS"), UNIVERSAL MUSIC GROUP, INC., ("UMG"), and LUCIAN GRAINGE ("GRAINGE") (collectively "DEFENDANTS"), and in support thereof states:

### OVERVIEW

1.     This is a suit for Breach of Contract, Tortious Interference with an Advantageous Business Relationship. Tortious Interference with a Contractual Relationship, Declaratory Relief, and Permanent Injunctive Relief. In addition and/or in the alternative, MANAGER seeks relief under an Unjust Enrichment theory.

THE WILLIAMS LAW GROUP. • 6273 Sunset Drive, Suite D3 • South Miami, Florida 33143
Telephone: (253) 970-1683 • Email: Andrew@TheWilliamsLG.com

## THE PARTIES

2.     MANAGER is incorporated in the State of Florida as a Florida Limited Liability Company with a principal address in Miami-Dade County, Florida. MANAGER conducts its business in the entertainment industry in Miami-Dade County, Florida.

3.     ALSINA p/k/a August Alsina, on information and belief, is a resident of Atlanta, Georgia, who is a professional recording artist.

4.     SANDERS n/k/a Sheila Alsina, on information and belief, is a resident of Houston, Texas. SANDERS is the mother of ALSINA, and served as his legal guardian at the time the contract in dispute was signed.

5.     NOONTIME is incorporated in the State of Georgia as a Georgia Limited Liability Company with a principal address in Roswell, Georgia. NOONTIME conducts its business in the entertainment industry in greater Atlanta, Georgia. NOONTIME formerly conducted business as Noontime Music, Inc., a Georgia Corporation, with a principal address in Atlanta, Georgia.

6.     LEE, on information and belief, is a resident of Atlanta, Georgia, who serves as one of ALSINA's managers and is, on information and belief, the Chief Executive Officer of NOONTIME. LEE knowingly encouraged the contravention of the management agreement that was entered into between MANAGER and ALSINA.

7.     ALBRIGHT, on information and belief, is a resident of Atlanta, Georgia, who serves as one of ALSINA's managers. ALBRIGHT knowingly encouraged the contravention of the management agreement that was entered into between MANAGER and ALSINA.

8.     DITTO, is incorporated in the United Kingdom as a Private Limited Company with a principal address in Liverpool, Merseyside County, England. DITTO maintains two

2

offices in the United States: one in Nashville, Tennessee and one in Austin, Texas.  DITTO operates as a worldwide online music distribution company.

9.      PARSONS, on information and belief, is a resident of Liverpool, United Kingdom.  PARSONS is the Chief Executive Officer of Ditto Music, and is the individual who directed and/or ratified the actions of DITTO in removing the recording in controversy from its distribution, which is more particularly described below.

10.     DEF JAM is incorporated in the State of Delaware as a Delaware Corporation with a principal place of business in New York, New York.  DEF JAM conducts its business in the entertainment industry as a record label primarily focusing on hip-hop and urban music. DEF JAM signed ALSINA to a recording contract referred to herein as the "Record Deal."

11.     BARTELS, on information and belief, is a resident of New York, New York. BARTELS is the Chief Executive Officer of Def Jam Records and on information and belief is the individual who directed and/or ratified the actions of Lynn Hernandez, Esq. when she sent the Cease and Desist Letter more particularly described below.

12.     UMG is incorporated in the State of Delaware as a Delaware Corporation with a principal place of business in Santa Monica, California.  UMG conducts its business in the entertainment industry and more specifically the music industry all over the world.  UMG owns DEF JAM.

13.     GRAINGE, on information and belief, is a resident of Los Angeles County, California and is Chairman and Chief Executive Officer of UMG.  On information and belief, GRAINGE is the individual who directed and/or ratified the actions of Lynn Hernandez, Esq. when she sent the Cease and Desist Letter more particularly described below.

3

## JURISDICTION AND VENUE

14.   This is an action for monetary damages, declaratory and injunctive relief.

15.   The Court has jurisdiction since the amount in controversy exceeds the sum of Fifteen Thousand ($15,000.00) Dollars, exclusive of interests and costs.

16.   This Court has personal jurisdiction over the Defendants under §48.193, Fla. Stat., because Defendants regularly conduct business in the State of Florida and because Defendants have committed tortious acts with the Plaintiff suffering injuries in Miami-Dade County, Florida.

17.   Venue and jurisdiction are also appropriate in Miami-Dade County based upon the parties' consent as set forth in the Artist Management Agreement (attached hereto as **Exhibit "A"** and referred to herein as the "Management Contract," and because all of the causes of action described herein occurred in Miami-Dade County, Florida.

## COMMON ALLEGATIONS

18.   On or about September 3, 2009, MANAGER, f/k/a Xclusive Management Group and ALSINA entered into an exclusive Artist Management Agreement.  A copy of the agreement is attached hereto as **Exhibit "A"** and referred to herein as the "Management Contract."

19.   SANDERS, ALSINA's mother, guaranteed the contract by signing her name as ALSINA's legal guardian at the time.

20.   Pursuant to the terms of the Contract, ALSINA pledged to be represented as a recording artist exclusively by MANAGER for MANAGER's benefit and so MANAGER would be protected as it entered into discussions with major record labels and branch distribution companies, including but not limited to DEF JAM, Interscope Records and Baluga Heights.

21.   MANAGER had specifically been in talks with DEF JAM executive, Karen Kwak ("KWAK"), about signing ALSINA.

4

22.     In exchange for the services to be provided by MANAGER, ALSINA granted MANAGER the exclusive ownership of all right, title and interest throughout the universe in and to the results and proceeds of ALSINA's works created during the duration of the Management Contract and to Fifteen (15%) percent of all revenue earned by ALSINA that was derived as a result of MANAGER's efforts.

23.     During the term of the Management Contract, MANAGER expended a substantial amount of time and money to help ALSINA record, cultivate his image, travel, and in promoting ALSINA to various record labels.

24.     During the term of the Management Contract, MANAGER expended a substantial amount of time and money to assist ALSINA in complying with his commitments under the Contract, including spending money on studio time.

25.     Pursuant to the Management Contract, ALSINA relinquished his rights in his works to MANAGER, and gave MANAGER the exclusive right to release, exploit, and distribute two musical recordings recorded by ALSINA.

26.     One of those recordings was mixed and edited to serve as a single for ALSINA and to be utilized by MANAGER to help secure a record contract and monetary benefits for ALSINA.

27.     The name of the single ALSINA recorded was "That Boy."

28.     "That Boy" was written and produced by Delvin Alexander ("ALEXANDER").

29.     MANAGER used "That Boy" to shop ALSINA and his talents to various record labels, including but not limited to, DEF JAM, Interscope and Baluga Heights.

30.     Under the Management Contract, MANAGER had complete ownership of the Recordings, including the right to: a) "use reasonable efforts to procure employment," b) the

5

right to negotiate for ALSINA and, c) the right to use ALSINA's name, image and likeness in connection with the sale and promotion of his recordings.

31.     On or around October 20, 2009, ALSINA began hindering MANAGER's obligations to him, by failing to respond to calls, text and emails.

32.     MANAGER was informed by SANDERS, that ALSINA had "run away" from home on or around October 23, 2009.

33.     Despite ALSINA's disappearance, MANAGER remained confident he could secure a record deal for ALSINA and continued to honor his end of the Management Contract and entered into discussions with various record labels.

34.     Upon information and belief, ALSINA was solicited by ALBRIGHT and LEE to represent him in a managerial capacity sometime after he had already entered into his Management Contract with MANAGER.

35.     ALSINA breached the Management Contract with MANAGER and entered in an agreement with LEE and ALBRIGHT, on information and belief, d/b/a NOONTIME, in violation and contrary to the terms of the Management Contract.

36.     ALSINA failed to properly serve notice to MANAGER of his intent to terminate the Management Contract in accordance with Florida Law.

37.     ALSINA did not have the right to terminate or record the Management Contract without cause and without returning the consideration given to him by MANAGER.

38.     MANAGER did not breach the Management Contract.

39.     ALSINA has not informed MANAGER of its specific breach of the Management Contract or provided MANAGER with sixty (60) days to cure such purported and currently unspecified breach.

6

40.     ALSINA's breach prevented MANAGER from being able to profit from ALSINA's sound recordings, advances, merchandise, live performances and concerts.

41.     ALSINA has not reimbursed MANAGER for its out-of-pocket costs and other consideration given to ALSINA by MANAGER.

42.     In all respects, MANAGER has complied with its obligations under the terms of the Management Contract.

43.     ALSINA authorized NOONTIME, LEE, and ALBRIGHT to enter into discussions with record labels on his behalf, including but not limited to, those with KWAK and DEF JAM.

44.     Ultimately, NOONTIME, LEE, ALBRIGHT secured a record deal for ALSINA for Three Million ($3,000,000.00) Dollars after negotiating with DEF JAM and KWAK.

45.     Despite ALSINA's breach, MANAGER maintained its catalog of music recorded by ALSINA under the Management Contract and remained the owner of the two recordings, including "That Boy."

46.     MANAGER signed, Carlson Pierre ("PIERRE"), who performs as Grimass, to an exclusive management agreement, on or about July 11, 2013, and discussed PIERRE re-recording "That Boy."

47.     On or about November 6, 2013, MANAGER orally contracted with ALEXANDER, the producer and writer of "That Boy," to enter into a licensing agreement enabling MANAGER to re-record and exploit "That Boy."

48.     PIERRE and Marc Arthur Geffard p/k/a Zoe Budha ("GEFFARD") re-recorded "That Boy," but left ALSINA's vocals on the track for the chorus. The song was renamed "I'm That Boy" (the "Recording").

7

49.     On or about April 22, 2015, MANAGER entered into a binding distribution agreement with DITTO, pursuant to which DITTO agreed to distribute the Recording across the universe. A copy has been attached as **Exhibit "B"** and referred to herein as the "Distribution Agreement."

50.     On or around April 27, 2015, DITTO began distributing the Recording through various distribution channels, including, but not limited to, iTunes and Spotify.

51.     In its first two days after "I'm That Boy" was released, the Recording received over 11,000 streams on Spotify and began developing national and international recognition. It received positive feedback in the United States, Germany, the United Kingdom, France, Japan, Switzerland and numerous other foreign countries.

52.     On May 21, 2015, Lynn Gonzalez, Esq., on behalf of DEF JAM and UMG sent a Cease and Desist Letter to PARSONS, DITTO, and MANAGER alleging that the use of the Recording was unauthorized.

53.     DITTO asked MANAGER to produce documentation that showed that MANAGER had the right to use the music. MANAGER provided DITTO with a copy of the licensing agreement MANAGER entered into with ALEXANDER, the writer and producer of the Recording. A copy of has been attached as **Exhibit "C"** (the "Licensing Agreement").

54.     Despite having knowledge that a valid Licensing Agreement existed, DITTO removed the Recording from iTunes and Spotify, cutting off the primary distribution channels for the Recording.

55.     DITTO was provided with a valid licensing agreement and should not have removed the Recording from distribution.

8

56.     MANAGER produced evidence of its ownership of the Recording and complied with DITTO's request, yet the Recording was still removed.   By removing the Recording, DITTO breached its Distribution Agreement with MANAGER.

57.     The agreement with DITTO states that MANAGER agrees to indemnify and reimburse DITTO against any "claim, liability, damages, loss or expense."   See **Exhibit "C"**. DITTO was never subject to any claim or damages and should not have removed the song prior to a court order or evidence supporting the contentions that the Recording was not validly owned by MANAGER.

58.     Evidence was produced showing that MANAGER had the right to exploit the Recording.  DITTO and PARSONS were informed of their breach on May 26, 2015, after having previously been warned by Plaintiff's counsel on May 12, 2015, that any such removal would constitute a breach.  To date, DITTO and PARSONS have failed to cure or rectify the breach.

59.     DITTO and PARSONS were well aware that removing the song from iTunes and Spotify would impact MANAGER's ability to profit from the Recording.

60.     Under the Management Contract, and the Licensing Agreement, MANAGER had the exclusive right to release, exploit and distribute the Recording worldwide.

61.     MANAGER, in reliance upon the rights granted to it under the aforementioned agreements, expended sums to promote the sale of the Recording and entered into an advantageous business relationship and contractual relationship with DITTO to distribute and sell the Recording.

62.     Based on its contract and its business relationship with DITTO, MANAGER had a reasonable expectation to earn profits from the distribution of the Recording.

9

THE WILLIAMS LAW GROUP. • 6273 Sunset Drive, Suite D3 • South Miami, Florida  33143
Telephone:  (253) 970-1683 • Email:  WilliamsLawFlorida@gmail.com

63.     Defendants, DEF JAM, UMG, ALSINA, BARTELS, and GRAINGE, without justification, intentionally interfered, and unless enjoined, will continue to intentionally interfere, with the business and contractual relationship that MANAGER has established with DITTO. Defendants have impeded and interfered with MANAGER's ability to sell, exploit and distribute the Recording, by wrongfully contending that MANAGER does not own the legal and proper rights to distribute and sell the Recording and by wrongfully claiming that MANAGER's sale of the Recording will infringe upon their rights under the Lanham Act.

64.     As of April 27, 2015, Defendants were placed on either actual or constructive notice of the existence of the contractual and/or business relationship between MANAGER and DITTO, pursuant to which DITTO would distribute the Recording for MANAGER.

65.     On or about May 21, 2015, DEF JAM and UMG sent a Cease and Desist Letter to DITTO, threatening DITTO that if they continued to distribute the Recording, that DEF JAM, and UMG would sue them, and DITTO would be liable to them for compensatory and treble damages, interest and attorneys' fees under the Lanham Act (the "Cease and Desist Letter").

66.     The Cease and Desist Letter was prepared, signed and distributed by Lynn Gonzalez, Esq. ("GONZALEZ"), the DEF JAM employee in charge of legal and business affairs at the direction, and/or with the acquiescence or knowledge of Defendant, BARTELS.

67.     At the time GONZALEZ sent the Cease and Desist Letter, DEF JAM had a well-known reputation in the music industry of being a litigious company.

68.     Defendants, DEF JAM and UMG, knew that based upon DEF JAM's litigious reputation and its threat of federal litigation, that the Cease and Desist Letter would intimidate and cause DITTO to cease distributing the Recording and cause resulting harm to MANAGER. DEF JAM and UMG so acted to enhance their own profits from the distribution of albums that

10

ALSINA recorded for DEF JAM and/or through DEF JAM's distribution entitled "Testimony" and "Downtown: Life Under the Gun." DEF JAM has asserted that it acquired certain rights to ALSINA's recordings pursuant to written agreements that it entered with ALSINA upon him signing his Record Deal.

69. ALSINA signed the Record Deal in 2012; however his agreement with MANAGER was entered into 2009, and thus predates the Record Deal and gives MANAGER a superior right.

70. At the time DEF JAM and UMG sent the Cease and Desist Letter, they knowingly and with malice overstated their legal rights, with respect to the Recording and the contractual rights that they obtained from ALSINA.

71. Defendants, DEF JAM and UMG, acted with the intent to stop DITTO's sale of the Recording and to cause harm to MANAGER. After receiving the Cease and Desist Letter, MANAGER responded by providing a copy of the Management Contract to GONZALEZ, thus informing her and DEF JAM that MANAGER had a legal and valid right to exploit and sell the Recording under its agreement with ALSINA and through its Licensing Agreement. GONZALEZ conducted no due diligence to confirm or deny these statements or to confirm the rights claimed in the Cease and Desist Letter.

72. Defendants, DEF JAM and UMG, did not have any rights in the Recording as it was recorded prior to ALSINA signing his Record Deal with them.

73. After receiving the response from MANAGER, GONZALEZ, on information and belief, forwarded the response to Donald Woodard, Esq. ("WOODARD"), ALSINA's attorney. WOODARD subsequently issued another Cease and Desist Letter threatening that if DITTO and MANAGER continued to distribute the Recording, ALSINA would sue, and DITTO would be

11

liable to them for compensatory and treble damages, interest and attorneys' fees under the Lanham Act, as well as an additional fee of Thirty Thousand ($30,000.00) Dollars to ALSINA.

74. At the time Defendants, DEF JAM, UMG and ALSINA sent their Cease and Desist Letters, they knew that they did not own or possess valid Lanham Act claims enforceable against the recipients of the Cease and Desist Letters because; (a) the terms of the Management Contract provided MANAGER with the right to exploit and distribute the Recording (b) the Management Contract predated the Record Deal and therefore is superior, and (c) in the alternative, the MANAGER's rights to the Recording and other works of ALSINA created during the Management Contract were implied-in-fact under the contract.

75. Defendants, DEF JAM, UMG and ALSINA sent Cease and Desist Letters intending to harm to MANAGER by interfering in the lawful activities of MANAGER and DITTO to sell and distribute the Recording. DEF JAM, UMG and ALSINA sent their Cease and Desist Letters in malicious disregard of MANAGER's lawful contractual rights.

76. DEF JAM and UMG also sent their Cease and Desist Letter to enhance their own profits in the sale of their own "August Alsina" albums entitled "Testimony" and "Downtown: Life Under the Gun."

77. DEF JAM and UMG knowingly and intentionally overstated their legal rights in the Cease and Desist Letter to intimidate DITTO into suspending and/or terminating its business and/or contractual relationship with MANAGER.

78. DEF JAM and UMG acted with express malice in their efforts to enhance their own profits to the detriment of MANAGER.

79. Because of the Management Contract and the Licensing Agreement, MANAGER has the exclusive right to release, exploit and distribute the Recording.

12

## COUNT I
## BREACH OF CONTRACT

80. Paragraphs 1 through 79 are incorporated as if set forth verbatim herein.

81. This is a count for Breach of Contract by Defendants, ALSINA and SANDERS.

82. Plaintiff and Defendants, ALSINA and SANDERS, executed the Management Contract on or about September 3, 2009.

83. The Management Contract provided for a minimum term of one (1) year.

84. Defendant, ALSINA's parent and/or legal guardian, SANDERS, also signed and guaranteed the Management Contract. See **Exhibit "A"**.

85. Plaintiff performed all of its obligations under the terms of the Management Contract.

86. Defendants, ALSINA and SANDERS, breached their obligations under the Management Contract by wrongfully attempting to terminate the contract without cause, without providing Plaintiff proper notice and without giving Plaintiff proper time to cure any breach committed by Plaintiff.

87. Defendants, ALSINA and SANDERS, further breached the Management Contract by engaging with third parties to perform the services that were exclusively granted to Plaintiff under the terms of the Management Contract.

88. Defendant, ALSINA, received a Three Million ($3,000,000.00) Dollar contract when he signed a Record Deal with DEF JAM. This deal was facilitated by KWAK, whom Plaintiff had previously been discussing a potential deal for ALSINA prior to his breach.

89. Under the Management Contract, Plaintiff is entitled to fifteen (15%) percent of any record deal ALSINA received. Therefore, had Defendant, ALSINA, not breached the

13

Management Contract, Plaintiff would have received Four Hundred and Fifty Thousand ($450,000.00) Dollars, plus fifteen (15%) percent from any performances, concerts and/or merchandise.

90.     As a result of Defendants, ALSINA and SANDERS', breaches of the Management Contract, Plaintiff has been damaged. Plaintiff is entitled to a judgment against Defendants in the principle amount of $450,000, plus additional damages to be determined at trial, associated with Defendants, ALSINA and SANDERS', breaches of contract.

**WHEREFORE,** for the reasons set forth herein, Plaintiff requests this Court to award compensatory damages, consequential damages, expectation damages, punitive damages and business losses in its favor and against Defendants, ALSINA and SANDERS, as a proximate result of Defendant, ALSINA's failure to fulfill his obligations under the Management Contract, and such further relief this Court deems to be just and proper.

**COUNT II**
**TORTIOUS INTERFERENCE WITH**
**ADVANTAGEOUS BUSINESS RELATIONSHIP**

91.     Paragraphs 1 through 79 are incorporated as if set forth verbatim herein.

92.     At all times material, Defendants, NOONTIME, LEE and ALBRIGHT, knew of the existence of the business relationship between MANAGER and ALSINA in which MANAGER exclusively was to provide managerial services to ALSINA, and was afforded the opportunity use its best efforts to secure a record deal for ALSINA and was entitled to compensation from any monies resulting therefrom.

93.     Defendants, NOONTIME, LEE and ALBRIGHT, maliciously, intentionally and/or unjustifiably interfered with this relationship by wrongfully soliciting their services to

14

THE WILLIAMS LAW GROUP. • 6273 Sunset Drive, Suite D3 • South Miami, Florida  33143
Telephone:  (253) 970-1683 • Email:  WilliamsLawFlorida@gmail.com

ALSINA in an attempt to circumvent the Management Contract that ALSINA already had in place with MANAGER.

94.    Defendants, through communication with MANAGER were aware of the relationship and agreement between MANAGER and ALSINA and continued to pursue ALSINA in an effort to interfere with the valid, lawful business relationship between MANAGER and ALSINA.

95.    Due to the conduct of Defendants, NOONTIME, LEE and ALBRIGHT, MANAGER has been damaged, based upon the anticipated revenue that MANAGER was likely to earn from the advantageous business relationship with ALSINA, in an amount in excess of Three Million Dollars.

**WHEREFORE**, Plaintiff, MANAGER, demands judgment against the Defendants, NOONTIME, LEE and ALBRIGHT, for compensatory damages, loss of good will, interest, punitive damages and such further relief as may be just and proper.

### COUNT III
### TORTIOUS INTERFERENCE
### WITH CONTRACTUAL RELATIONSHIP

96.    Paragraphs 1 through 79 are incorporated as if set forth verbatim herein.

97.    At all times material, Defendants, NOONTIME, LEE and ALBRIGHT, knew of the existence of a contractual relationship between MANAGER and ALSINA, pursuant to which MANAGER was to use its best efforts to secure a record deal for ALSINA and receive a percentage of monies resulting therefrom.

98.    Defendants, NOONTIME, LEE and ALBRIGHT, intentionally and unjustifiably interfered with this contract by wrongfully soliciting their services to ALSINA in an attempt to circumvent the Management Contract that ALSINA already had in place with MANAGER.

15

99.     Defendants, NOONTIME, LEE and ALBRIGHT, maliciously, intentionally and/or unjustifiably interfered with the contract between MANAGER and ALSINA so they could earn profits from securing a record deal for ALSINA and from his future success.

100.    Due to the conduct of Defendants, NOONTIME, LEE and ALBRIGHT, MANAGER has been damaged, based upon the anticipated revenue that MANAGER was likely to earn from the Management Contract with ALSINA in an amount in excess of Three Million Dollars.

**WHEREFORE**, Plaintiff, MANAGER, demands judgment against the Defendants, NOONTIME, LEE and ALBRIGHT, for compensatory damages, loss of good will, interest, punitive damages and other relief that may be just and proper.

## COUNT IV
## BREACH OF CONTRACT

101.    Paragraphs 1 through 79 are incorporated as if set forth verbatim herein.

102.    This is a count for Breach of Contract by Defendants, DITTO and PARSONS.

103.    Plaintiff and Defendants, DITTO and PARSONS, executed the Distribution Agreement on or about April 22, 2015.

104.    The Distribution Agreement provided for a minimum term of one year, and provided that DITTO would distribute the Recording.

105.    Plaintiff performed all of its obligations under the Distribution Agreement.

106.    Defendants, DITTO and PARSONS, informed Plaintiff of allegations by DEF JAM that MANAGER's use of the Recording was unauthorized. Plaintiff explained to DITTO and PARSONS that its rights predated DEF JAM's and provided the valid Licensing Agreement to DITTO and PARSONS.

16

107.     Under the Distribution Agreement, Plaintiff agreed to indemnify Defendants, DITTO and PARSONS, against "any claims, liabilities, damages, losses, or expenses (including legal fees) suffered or incurred by [DITTO] as a result of [MANAGER's] breach" of any warranties or undertakings in the Distribution Agreement.

108.     Defendants, DITTO and PARSONS, were never subjected to any claim, lawsuit, damages or loss.  Instead, they unjustly and without cause removed the Recording from distribution causing monetary harm to Plaintiff.

109.     Defendants, DITTO and PARSONS, breached their obligations under the Distribution Agreement when they wrongfully removed the Recording from the iTunes and Spotify distribution channels without cause, without providing Plaintiff proper notice and without Plaintiff's consent despite having knowledge and evidence from Plaintiff that its use was legitimate.

110.     The Recording developed worldwide acclaim after being streamed and downloaded over tens of thousands of times in its first two days in several countries across the world, including, but not limited to, the United States, Germany, the United Kingdom, France, Japan and Switzerland.

111.     Under the Distribution Agreement, Plaintiff was entitled to monies from any streaming and/or downloading of the Recording.

112.     By removing the Recording from distribution channels, Plaintiff was denied the ability to profit from the Recording it rightfully owned.

113.     As a result of Defendants, DITTO and PARSONS', breaches of the Distribution Agreement, Plaintiff has been damaged.

**WHEREFORE,** for the reasons set forth herein, Plaintiff requests this Court to award

17

compensatory damages, consequential damages, punitive damages and business losses in its favor and against Defendants, DITTO and PARSONS, as a proximate result of Defendants, DITTO and PARSONS', failures to fulfill their obligations under the Distribution Agreement, and such further relief this Court deems to be just and proper.

**COUNT V**
**TORTIOUS INTERFERENCE WITH**
**ADVANTAGEOUS BUSINESS RELATIONSHIP**

114.     Paragraphs 1 through 79 are incorporated as if set forth verbatim herein.

115.     At all times material, Defendants, DEF JAM, UMG, ALSINA, BARTELS, and GRAINGE knew of the existence of the business relationship between MANAGER and DITTO, in which DITTO distributed the Recording and paid monies to MANAGER resulting therefrom.

116.     Defendants, DEF JAM, UMG, ALSINA, BARTELS, and GRAINGE, maliciously, intentionally and/or unjustifiably interfered with this relationship by wrongfully and without justification asserting in Cease and Desist Letters to DITTO and MANAGER, that MANAGER did not have legal rights to the Recording, and that the sale of the Recording would affect the rights of DEF JAM, UMG, ALSINA, BARTELS, and GRAINGE and subject the recipients to Lanham Act claims and expensive litigation.

117.     Defendants sent Cease and Desist Letters intending to intimidate their recipients in an effort to interfere with the valid, lawful business relationship between DITTO and MANAGER.

118.     Due to the conduct of Defendants, DEF JAM, UMG, ALSINA, BARTELS, and GRAINGE, MANAGER has been damaged, based upon the anticipated revenue that MANAGER was likely to earn from the advantageous business relationship with DITTO and its distribution channels.

18

THE WILLIAMS LAW GROUP. • 6273 Sunset Drive, Suite D3 • South Miami, Florida 33143
Telephone: (253) 970-1683 • Email: WilliamsLawFlorida@gmail.com

**WHEREFORE**, Plaintiff, MANAGER, demands judgment against the Defendants, DEF JAM, UMG, ALSINA, BARTELS, and GRAINGE for compensatory damages, loss of good will, interest, punitive damages and such further relief as may be just and proper.

**COUNT VI**
**TORTIOUS INTERFERENCE**
**WITH CONTRACTUAL RELATIONSHIP**

119.     Paragraphs 1 through 79 are incorporated as if set forth verbatim herein.

120.     At all times material, Defendants, DEF JAM, UMG, ALSINA, BARTELS, and GRAINGE knew of the existence of a contractual relationship between MANAGER and DITTO, pursuant to which DITTO would distribute the Recording and pay monies to MANAGER resulting therefrom.

121.     Defendants, DEF JAM, UMG, ALSINA, BARTELS, and GRAINGE, intentionally and unjustifiably interfered with this contract by asserting in Cease and Desist Letters to DITTO that MANAGER did not have the legal right to authorize the distribution of the Recording and that the distribution of the Recording would infringe upon the rights of Defendants, DEF JAM, UMG, ALSINA, BARTELS, and GRAINGE, and subject the recipients to Lanham Act claims and expensive litigation.

122.     Defendants, DEF JAM, UMG, ALSINA, BARTELS, and GRAINGE, sent Cease and Desist Letters intending to intimidate DITTO to breach its contract with MANAGER.

123.     Defendants, DEF JAM, UMG, ALSINA, BARTELS, and GRAINGE, maliciously, intentionally and or unjustifiably interfered with the contract between MANAGER and DITTO so that they could earn additional profits from the sale of their competing August Alsina albums and songs.

19

124.     Due to the conduct of Defendants, MANAGER has been damaged, based upon the anticipated revenue that MANAGER was likely to earn from its Distribution Agreement with DITTO.

**WHEREFORE**, Plaintiff, MANAGER, demands judgment against the Defendants, DEF JAM, UMG, ALSINA, BARTELS, and GRAINGE, for compensatory damages, loss of good will, interest, punitive damages and other relief that may be just and proper.

## COUNT VII
## DECLARATORY RELIEF

125.     Paragraphs 1 through 79 are incorporated as if set forth verbatim herein.

126.     This is a count for declaratory relief pursuant to Florida Statute Chapter 86 et seq.

127.     Plaintiff and Defendants, DEF JAM, UMG, ALSINA, BARTELS, and GRAINGE, have an actual present, adverse and antagonistic interest in the subject matter of this action.

128.     The antagonistic and adverse interest is all before the Court by proper process, and the relief sought is not for legal advice by the Court nor to answer questions propounded from curiosity.

129.     Defendants, DEF JAM, UMG, BARTELS, and GRAINGE, have asserted to third parties that they possess agreements which confer upon them certain rights to ALSINA's work under his Record Deal.

130.     The Record Deal is of no effect upon MANAGER's rights to the Recording because the Record Deal could not abridge ALSINA's prior grant of rights in favor of MANAGER in the Management Contract and/or in the alternative, his relinquishment of his rights which is the implied-in-fact under the Management Contract.

20

131.    Based upon the assertions made by Defendants, DEF JAM, UMG, ALSINA, BARTELS, and GRAINGE to third parties, MANAGER is in doubt as to the rights conferred by the Record Deal and MANAGER's ownership of the Recording and needs the Court to declare that its rights with respect to the Recording are superior to that of Defendant's, DEF JAM, UMG, ALSINA, BARTELS, and GRAINGE.

**WHEREFORE**, Plaintiff, MANAGER, requests that the Court declare that its rights in the Recording are superior to DEF JAM, UMG, ALSINA, BARTELS, and GRAINGE and that MANAGER has the exclusive right to sell, market, distribute, and exploit the Recording.

## COUNT VIII
## PERMANENT INJUNCTIVE RELIEF

132.    Paragraphs 1 through 79 are incorporated as if set forth verbatim herein.

133.    This is a count for permanent injunctive relief to prevent Defendants, DEF JAM, UMG, ALSINA, BARTELS, and GRAINGE, from interfering and preventing MANAGER and other third parties from being able to sell, distribute and profit off the Recording.

134.    MANAGER has the exclusive right to sell, distribute and exploit the Recording and MANAGER's rights to the Recording are superior to any of the rights of Defendants, DEF JAM, UMG, ALSINA, BARTELS, and GRAINGE, concerning the Recording based on MANAGER's Management Contract or in the alternative Manager's implied-in-fact Management Contract with ALSINA, and the Licensing Agreement.

135.    MANAGER has been irreparably harmed and will continue to be irreparably harmed due to the conduct of Defendants, DEF JAM, UMG, ALSINA, BARTELS, and GRAINGE, which impedes MANAGER's ability to exploit and profit from the Recording.

136.    MANAGER has no adequate remedy at law.

21

137.   MANAGER has a clear legal right to the relief sought herein.

138.   The entry of an injunction will serve the public interest.

**WHEREFORE**, Plaintiff, MANAGER, for the reasons set forth herein requests that the Court permanently enjoin Defendants, DEF JAM, UMG, ALSINA, BARTELS, and GRAINGE, their employees, officers, licensees, agents, and others acting at their direction, from interfering with MANAGER's exploitation and ability to profit off the Recording.

## COUNT IX
## UNJUST ENRICHMENT

139.   Paragraphs 1 through 79 are incorporated as if set forth verbatim herein.

140.   This is a count for unjust enrichment.

141.   Plaintiff introduced Defendant, ALSINA to record companies and began trying to obtain a record deal for the benefit of Defendant, ALSINA.

142.   Plaintiff financially supported Defendant, ALSINA, by expending money on items including, but not limited to, flights, hotels, photo shoots, marketing materials, and studio time.

143.   Plaintiff provided such benefits under the belief that it was secured by the Management Contract with Defendant, ALSINA, and that it would recoup any expenditure after securing a record deal for ALSINA.

144.   Defendant, ALSINA, knew of the benefits that resulted from Plaintiff's efforts.

145.   Defendant, ALSINA, accepted the benefits that followed from Plaintiff's efforts.

146.   It would be inequitable and unjust for the Defendant, ALSINA, to retain such benefits without providing fair compensation.

22

WHEREFORE, Plaintiff, MANAGER, demands judgment against Defendants, ALSINA and SANDERS, for compensatory damages, loss of good will, interest, punitive damages and such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

WHEREFORE, Plaintiff respectfully prays for the above requested relief and demands a trial by jury for all issues so triable.

Dated: December 1, 2015

THE WILLIAMS LAW GROUP
*Attorney for Plaintiff*
6273 Sunset Dr, Suite D-3
South Miami, Florida 33143
Telephone: (253) 970-1683
Email: Andrew@TheWilliamsLG.com
Secondary Email: WilliamsLawFlorida@gmail.com

By: _____
ANDREW WILLIAMS
FL Bar No. 0111817

23

EXHIBIT A

# XCLUSIVE MANAGEMENT GROUP

## ARTIST- MANAGEMENT CONTRACT

1   I, AUGUST ALSINA   and guardian, *Sheila Sunlas* hereby employ you, GAVIN A. FINDLAY   as my sole and exclusive artist manager for a period of 1 year (not to exceed 7) from date hereof to negotiate contracts for the rendition of my professional services as a singer, performer or otherwise in the fields of motion pictures, legitimate stage, radio broadcasting, television, and other fields of entertainment.

2.   You hereby agree to advise and counsel me in the development and advancement of my professional career and to use reasonable efforts to procure employment and to negotiate for me, as aforesaid

3.   As compensation for your said services agreed to be rendered here under, I hereby agree to pay you a sum equal to FIFTEEN PERCENT (15%) (not to exceed maximum rate shown on fee schedule) of all monies or things of value as and when received by me, directly or indirectly, as compensation for my professional services rendered or agreed to be rendered during the term hereof under contracts, or any extensions, renewals, modifications or substitutions thereof, entered into or negotiated during the term hereof and to pay the same to you thereafter for so long a time as I receive compensation on any such contracts, extensions, options or renewals of said contracts. It is expressly understood that you shall be entitled to continue to receive the payment of compensation on the aforementioned contracts after the termination of this agreement only if you continue to serve me and to perform obligations with respect to said employment contracts or to extensions or renewals of said contracts or to any employment requiring my services on which such compensation is based.

4.   I hereby agree that you may render your services to others during the terms hereof

5.   In the event that I do not obtain a bona fide offer of employment from a responsible employer during a period of time in excess of six (6) consecutive months, during all of which said time I shall be ready, able, willing and available to accept employment, either party hereto shall have the right to terminate this contract by notice in writing to that effect sent to the other by registered mail.

6.   Controversies arising between us under the provisions of the (State) of FL   Labor Code relating to artists' managers and under the rules and regulations for the enforcement thereof, shall be referred to the Labor Commissioner of the State of FL   and/or through the court system within the state of FL.

7   This instrument constitutes the entire agreement between us and no statement, promises or inducement made by any party hereto which is not contained herein shall be binding or valid and this contract may not be enlarged, modified or altered, except in writing by both the parties hereto.

DATED   *September 3, 09*

AGREED TO AND ACCEPTED BY:

EXHIBIT B



HOME   GET TO KNOW US   SELL YOUR MUSIC   PRICING   ARTISTS        PROMOTION   GET IN TOUCH        LOGIN   SIGN UP

# Terms & Conditions

1. This Agreement governs the relationship between Ditto Ltd. t       : as Ditto Music of 29-31
Parliament Street, Liverpool, L8 5RN, Company No 03976764            e/our') and
_____ ('you/your/the Artist') in respect of any   . . .al works or sound recordings
('Works') that you submit to us for inclusion in any of the services ('Service') as defined on
www.dittomusic.com, in writing or verbally agreed.

2. In consideration of the sums payable to you and the services provided by us pursuant to this
Agreement, you grant to us and our licensees a non-exclusive, world-wide license to use, reproduce,
distribute, display, publicly perform, exhibit, broadcast and transmit and make available the Works
for distribution in the Service and for all promotional purposes including without limitation for the
purposes of internet radio broadcast; and use, reproduce and display in the Service any trademarks,
service marks or trade names relating to you and the name and likeness of you and the band/artist
whose performances are embodied in the Works.

3  You grant to us (on behalf of yourself) all necessary consents under the Copyright, Designs and
Patents Act 1988 ('Act') and any modification or re-enactment thereof to enable us to make the
fullest possible use of the Works in accordance with the provisions of this Agreement including
without limitation any and all consents required under Part II of the Act. The Artist will hold
copyright at all times.

4  Standard Service prices shall be listed at www.dittomusic.com, agree verbally or in writing.
Services carried out shall be as listed on www dittomusic.com at time of purchase. We reserve the
right to renegotiate payment amount in the event that additional non-standard services are
requested  In such case all prices shall be agreed by both parties in writing and paid in full before
commencement. We are not obliged to provide any services above and beyond what has been paid
for  Upon third party failure to fulfil service we shall assist with 'best endeavours' but are not
responsible or liable for such failure.

5  Payment shall only be made to You if accumulated outstanding earnings exceed 25GBP. This
threshold shall be carried over until such a time as it is attained. Only monies earned within the
preceding months shall be paid and only if received from retailer/licensee  As regards royalty
payment to You, any transaction charges shall be passed on  You agree that Your user account and
revenue may be frozen at Our discretion if We believe that materials submitted to Us by You are
illegal, fraudulent or violate the terms of service of Ditto or any of Our partners  If such submitted
material is found to be as the previous sentence then service fees paid to Us and also subsequent
royalties shall be forfeited  You agree that royalty payments will only be made once We have
received appropriate and verified licensing documents to cover the volume of sales in appropriate
territories

6  You warrant, agree and undertake both on behalf of yourself that the Works are original to you and have not been copied from any third party; the Works do not infringe any copyright, trademark or other proprietary or intellectual property rights of any third party or include any material which are defamatory of any party or obscene; you are not under any disability, restriction or prohibition, whether contractual or otherwise with respect to your right, power and authority to enter into and perform this Agreement and grant the rights herein expressed to be granted to us and in particular, the Works do not contain any viruses or other programming routines that detrimentally interfere with computer systems or data  You warrant that you have obtained appropriate licensing for cover versions for release within territories needing such.

7, You agree to indemnify and reimburse Us in full via Your royalty balance and/or separate payment against any claims, liabilities, damages, losses or expenses (including legal fees) suffered or incurred by us as a result of your breach of any of the warranties or undertakings in this Agreement, or any claims by any third party including but not limited to claims for payment of outstanding debts for services provided or goods supplied by such third parties,

8a  This Agreement may be terminated by you upon 1 days written notification (including notification by email) of such termination providing there are no outstanding payments due to us and that such may be taken from your royalty balance. It is your obligation to cancel the storage and maintenance subscription at this point. Any further subscription payments shall be forfeited. Upon contract termination We shall instruct our partners within 30 days to remove recordings from all platforms. We are not responsible for third-party exploitation after removal instruction. You are responsible for any third-party take-down fees.

8b. This Agreement may be terminated by us upon 1 days written notification (including notification by email) of such termination providing there are no outstanding Services due to you. Upon cancellation in this regard, We shall instruct our partners within 30 days to remove recordings from all platforms. For any service requiring a subscription we may cancel (at our discretion) the Service without reimbursement if such subscription becomes no longer active  We are not responsible for third-party exploitation after removal instruction. You are responsible for any third-party take-down fees.

8c  Refund shall only be given if We are proven to be in direct violation of this Agreement.

8d, We have the right to terminate this Agreement immediately if We believe You are engaging in fraudulent or illegal activity, or following any behaviour deemed by Us as threatening. disrespectful, unprofessional or otherwise carried out by You or any associated parties. Any breach of our terms and conditions by You would result in a non refund of payment

9  The Artist will submit all content in a Work within a reasonable and pre-agreed time for release and distribution in an agreed format. Upon late submission We shall try best endeavours to perform the agreed Services  We are not obliged to commence Services before receipt of ALL necessary content. Ditto Music is not responsible for third-party failure to make content commercially available  Ditto Music is not responsible for third-party failure to make content commercially available, remove content from sale, adhere to instructions submitted or fulfil any action requested in any way by You or Us.

10 The Artist and representatives shall at all times refer to available help material before contacting us This includes all known resources provided by us, including but not limited to help documents, online data, written and oral advice Subject to our discretion, violation of this will lead to Agreement cancellation after one written warning from us

11. Each party to this agreement shall keep confidential all information disclosed within the agreement and up to two years after termination.

12 You shall provide accurate contact details for you and/or your representative(s). If supplied payment details are inaccurate any monies paid towards You using these incorrect details shall be forfeited.

13. In the event that we are required to perform Catco/PPL registration on your behalf you grant us permission to act as rights holder for all submitted tracks. This copyright is for purely administrative purposes and is a legal requirement of the PPL. This does not affect any other copyrights mentioned in this Agreement.

14. A 'fair usage policy' applies to the Unlimited Distribution package, which can be enforced at Our discretion. This package is intended for individual artists rather than labels, applies only to releases uploaded by You via www.dittomusic.com, and is digital distribution to the 'Essentials' package only with no services or bolt-ons added.

15. Neither party shall be liable for failure to perform or delay in performing any obligation under this Agreement if the failure or delay is caused by any circumstances beyond its reasonable control, including but not limited to 'acts of God', war, civil commotion or industrial dispute If such act shall make performance of this Agreement impossible for more than three months shall be treated as frustrated and terminated at that date.

16 This Agreement constitutes the entire agreement between us in respect of the subject matter of it and no terms, obligations, representations, promises or conditions, oral or written, express or implied have been made or relied upon, other than those contained in it. The provisions contained in each clause and sub-clause of this Agreement shall be enforceable independently of each of the others and its validity shall not be affected if any of the others is invalid. If any of those provisions is void but would be valid if some part of the provision were deleted, the provision in question shall apply with such modification as may be necessary to make it valid

17. This Agreement shall be construed and performed in all respects in accordance with and shall be governed by the laws of England and Wales and the parties irrevocably submit to the exclusive jurisdiction of the English courts. In the event of a dispute between the Parties arising out of this deed, they undertake to attempt to settle the dispute by engaging in good faith with the other in a process of mediation before commencing arbitration or litigation.

18. Unless terminated under clause 8a, 8b, 8c, 8d or 14 the term of this Agreement shall be one year from the Effective Date written below and will automatically renew for successive one year periods unless either Party provides written notice to the other Party to terminate this Agreement at least 30 days before the next anniversary of this Agreement.

19. The Parties agree that no third party will acquire any third party rights under this contract, and the provisions of the Contracts (Rights of Third Parties Rights) Act 1999 are expressly excluded.

Sign up and start uploading music in less than 5 minutes        GET STARTED

# DI++O

## Introducing Ditto Music

We're a small digital music distribution company based in the UK, but our artists chart all over the world's biggest stores.

We're passionate about understanding our customers' wants and needs. We give you everything a major label would, and allow private control over whatever the distribution may be. We make it easy for you to get your music out there the way you want.

We're also Artist friendly company.

## Sign Up Today

Create Your Account
Sell Your Music
Other Products & services
What Is Ditto Music
Our Team
Contact Us
Terms & Conditions
Site Map

Ditto Music North America
105 Sycamore St, HHG CA

## Mailing List

Sign up for our newsletters about what we're up to

Forename

Surname

Email Address

SUBMIT

## Get Social

Follow us here on all our social pages

facebook
twitter
Instagram

 

EXHIBIT C

# MUSIC LICENSE AGREEMENT

This Music License Agreement ("Agreement") is entered into effective December 8th, 2014 (the "Effective Date"), by and between Pentagon Productions, Inc., a Florida corporation with an office at 18952 NW 27th Ave, Suite 212, Miami Gardens, FL 33056 ("Copyright Owner"), and Dynasty Management Group, LLC, a limited liability company with an office at 11488 Lakeview Drive, Coral Springs, Florida 33071 ("Licensee").

## RECITALS:

WHEREAS, the Copyright Owner owns the copyright, publishing rights, and all other related rights in and to the musical composition, entitled "Dat Boy" ("Song"); and

WHEREAS, the Copyright Owner is authorized to issue a license to the Song; and

WHEREAS, the Licensee desires to obtain the rights to use and exploit the Song; and

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable considerations, Copyright Owner and Licensee agree as follows:

1.  <u>Rights Granted.</u>  Copyright Owner hereby grants to Licensee, its successors and assigns, the irrevocable and perpetual right, license and privilege throughout the World ("Territory") to:

    1.1    Record, re-record, produce and reproduce, the lyrics and musical compositions, or any portion thereof of the Song in whatever medium Licensee chooses (i.e. video tape, film, CD ROM, DVD, digital formats, or any format yet to be discovered).

    1.2    Publicly perform and authorize others to perform the Song.

2.  <u>Copyright Owner's Rights and Obligations.</u>

    2.1    The Copyright Owner warrants and represents that he owns all right, title and interest in and to the Song, including, but not limited to, all copyrights.

    2.2    The Copyright Owner reserves unto himself all rights of every kind and nature except those specifically granted to Licensee herein; provided, that Copyright Owner shall not grant any rights to use the Song, or any portion thereof, in any other musical composition work without Licensee's written

Confidential and proprietary material for authorized Copyright Owner and Licensee only.
Use, disclosure or distribution of this material is not permitted to any unauthorized persons or third parties except by written agreement.

1

Dynasty Management Group                 Pentagon Productions, Inc.

consent, unless Licensee fails to release the Song to the public on or before 12/8/2019.

3. <u>Licensee's Rights and Obligations</u>.

    3.1    The Licensee shall be solely responsible for providing all funding and technical expertise for the recording, re-recording, distribution, production and reproduction of the Song.

    3.2    The Licensee shall hold the copyright to any works it creates under this Licensing Agreement.

    3.3    The Licensee shall credit the Copyright Owner in the liner notes of any recording, re-recording, production and reproduction of the Song regardless of the medium.

4. <u>Warranty and Indemnification</u>. The Copyright Owner warrants and represents that he has the full right, power and authority to enter into this Agreement and to grant the rights granted herein; that he has not previously licensed the rights to the Song to any third party; and that the Licensee's inclusion and use of the Song in any new works or musical compositions will not violate any rights of any kind or nature whatsoever of any third party.

Copyright Owner shall indemnify and hold harmless Licensee, its successors, assigns and licensees, and the respective officers, directors, agents and employees, from and against any and all claims, damages, liabilities, costs and expenses (including reasonable attorneys' fees), arising out of or in any way connected with any breach of any representation or warranty made by Copyright Owner herein.

5. <u>Term and Termination.</u> The term of this agreement shall be in perpertuity, unless terminated due to the following events:

    5.1    Agreement shall be subject to termination at the election of the Copyright Owner, in the event that the Licensee fails to begin distributing Song within five (5) years of the date on which all parties have signed this Agreement, by written notice given by Copyright Owner to Licensee within thirty (30) days of the running of that five (5) year period; or

    5.2    This Agreement shall be subject to termination at the election of Copyright Owner, by written notice to Licensee, where there has been a default in the due observance or performance of any material covenant, condition or agreement herein by Licensee, and such default has continued for a period of thirty (30) days after written notice specifying the same shall have been given by Copyright Owner; or

Confidential and proprietary material for authorized Copyright Owner and Licensee only.
Use, disclosure or distribution of this material is not permitted to any unauthorized persons or third parties except by written agreement.

Dynasty Management Group          Pentagon Productions, Inc.

5.3    This Agreement shall be subject to termination at the election of Licensee, by written notice to Copyright Owner, where there has been a default in the due observance or performance of any material covenant, condition or agreement herein by Copyright Owner, and such default has continued for a period of thirty (30) days after written notice specifying the same shall have been given by Licensee; or

5.4    Upon the mutual consent of Copyright Owner and Licensee.

5.5    Termination or expiration of this Agreement shall not extinguish any of Licensee's or Copyright Owner's obligations under this Agreement (including, but not limited to, Licensee's obligation to pay royalties) which by their terms continue after the date of termination or expiration.

6.    <u>Right of First Refusal</u>. Licensee shall have a right of first refusal to acquire the rights to the Song owned by Copyright Owner in the event Copyright Owner files for bankruptcy or reaches an agreement with a third party for the sale of such rights. For the purpose of this paragraph, "right of first refusal" shall mean that prior to entering into any agreement with a third party, Copyright Owner shall give written notice to Licensee of the terms and conditions which Copyright Owner is then prepared to accept from such third party, and Licensee shall have the right, within twenty (20) business days of such notice, to given written notice to Copyright Owner that Licensee elects to enter into an agreement with Copyright Owner on those identical terms and conditions, in which event Copyright Owner shall enter into an agreement with Licensee on such terms and conditions. If Licensee does not, within twenty (20) business days, so notify Copyright Owner, Copyright Owner shall be free to enter into an agreement with the third party on such terms and conditions.

7.    <u>Choice of Law</u>. This Agreement shall in all respects be governed by and construed under the laws of the State of Florida except to the extent, if any, that those laws may have been preempted by the laws of the United States.

8.    <u>Parties to be Bound</u>. This Agreement shall be binding upon, and shall inure to the benefit of, the parties themselves and to the benefit of the successors and assigns of the Copyright Owner and the heirs, representatives and beneficiaries of the Licensee.

9.    <u>Construction</u>. Any use of the singular person shall be taken to include the plural, and vice versa, as may be appropriate. Any titles, captions or paragraph headings in this Agreement are inserted for purposes of convenience and reference only, and do not operate to define or modify the related portions of text.

Confidential and proprietary material for authorized Copyright Owner and Licensee only.
Use, disclosure or distribution of this material is not permitted to any unauthorized persons or third parties except by written agreement.

Dynasty Management Group            Pentagon Productions, Inc.

10. Severability. If any provision of this Agreement is held to be illegal or void, the illegality or invalidity is not to affect the remaining provisions of this Agreement, but the illegal or invalid provision is to be fully severable, and the Agreement is to be construed and enforced as if that provision had never been inserted.

11. Assignment. The Copyright Owner may not assign any portion of this Agreement without prior written consent of Licensee.

12. Entire Agreement. This instrument, contains the entire agreement of the parties and supersedes all prior agreements. It may not be changed orally but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification, extension or discharge is sought.

13. Headings. The descriptive headings used throughout this Agreement are inserted for convenience only, and do not constitute a part of this Agreement.

14. Notice. All notices given pursuant to this Agreement or pursuant to any of the instruments contemplated hereunder shall be deemed to have been properly given if hand-delivered or if mailed addressed to the appropriate party, postpaid, registered or certified mail.

Copyright Owner:    Delvin Alexander
                    Pentagon Productions, Inc.
                    18952 NW 27th Ave, Suite 212
                    Miami Gardens, FL 33056

Licensee:           Gavin Findlay
                    Dynasty Management Group, LLC.
                    11488 Lakeview Drive
                    Coral Springs, Florida 33071

Any party may, from time to time, designate by written notice any other address or part to which copies of such notice of communication shall be sent.

15. Drafting of Agreement. Copyright Owner and Licensee agree that this Agreement was and is jointly drafted between them. Therefore, any interpretation of any ambiguity shall not be construed as against one or the other.

16. Waiver. The waiver by either party, or the failure by either party to claim a breach of any provision herein, will not be, or be held to be, a waiver of any breach, subsequent breach or different breach unless said waiver is set forth by writing.

Confidential and proprietary material for authorized Copyright Owner and Licensee only.
Use, disclosure or distribution of this material is not permitted to any unauthorized persons or third parties except by written agreement.

4

Dynasty Management Group                    Pentagon Productions, Inc.

18. <u>Successors</u>. Any reference to Copyright Owner in this Agreement also includes and shall be deemed to refer with equal force and effect to any corporation or other successor entity of Copyright Owner which shall acquire, directly or indirectly, by merger, consolidation, purchase, or otherwise, all or substantially all of the assets of the Copyright Owner.

IN WITNESS WHEREOF, the parties hereby enter into this Agreement as of the Effective Date.

Copyright Owner: _____
By: Delvin Alexander
Pentagon Productions, Inc.

Date: 12/8/14 _____

Licensee: _____
By: Ga vin Findlay
Dynasty Management Group, LLC.

Date: 12/8/14 _____

Confidential and proprietary material for authorized Copyright Owner and Licensee only.
Use, disclosure or distribution of this material is not permitted to any unauthorized persons or third parties except by written agreement.

Dynasty Management Group

Pentagon Productions, Inc.